**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | | |
|---|---|---|
| ADAPTIVE HOSPICE, LLC d/b/a ST. CROIX HOSPICE,<br><br>Plaintiff,<br><br>v.<br><br>BRISTOL HOSPICE - INDIANA, LLC d/b/a BRISTOL HOSPICE - NEW ALBANY, YEMETRI RUSSELL,<br><br>Defendants. | ) | Case No. 4:26-cv-00061-TWP-KMB |

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

This matter is before the Court on Plaintiff Adaptive Hospice, LLC d/b/a St. Croix Hospice's ("St. Croix") Motion for Preliminary Injunction (Filing No. 16). St. Croix seeks injunctive relief against its former employee, Defendant Yemetri Russell ("Russell"),[1] and her new employer, Defendant Bristol Hospice - Indiana, LLC d/b/a Bristol Hospice - New Albany ("Bristol"), to prevent violations of Russell's restrictive covenants and the solicitation of St. Croix's patients. For the reasons discussed below, St. Croix's Motion for Preliminary Injunction is **denied**.

## I. BACKGROUND

### A. St. Croix and Russell's Employment

St. Croix provides hospice services in several states, including the New Albany, Indiana, area (Filing No. 7 ¶¶ 2, 22). Approximately six to eight hospice providers operate in the New Albany area, including St. Croix's competitor Bristol, which entered the New Albany market in September 2025 (Filing No. 27-1 ¶¶ 3–5). St. Croix's hospice plans are tailored to their patients and executed by a multi-disciplinary team of physicians, nurses, hospice aides, social workers, and

[1] It appears St. Croix misspelled Russell's last name as "Rusell" on the docket when opening this action.

others (Filing No. 7 ¶¶ 23–24). As part of its care services, St. Croix builds relationships with its patients and collects their sensitive Protected Health Information ("PHI"). *Id.* ¶ 42; (Filing No. 16-2 ¶ 5). St. Croix seeks to protect its patients from improper solicitation and to prevent the disclosure of patients' PHI (Filing No. 16-3 ¶¶ 7, 12). It also seeks to protect its other valuable proprietary information like patient lists, aggregated patient data, confidential business and marketing plans, and goodwill in the New Albany area. *Id.* ¶¶ 14–15. St. Croix takes several steps to protect its confidential information, including the confidentiality agreements and policies, limited access to confidential information, password protected systems, robust security systems, and training on the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). *Id.* ¶¶ 7, 10–11.

Russell began working for St. Croix as a hospice aide in September 2024 (Filing No. 1 ¶¶ 39, 51). In that role, Russell worked alongside St. Croix nurses to provide compassionate end-of-life services to patients (Filing No. 27-5 ¶ 2). Russell was given access to St. Croix's confidential information, including PHI and other private information about St. Croix's patients, and she was provided training on accessing and utilizing that confidential information (Filing No. 7 ¶ 42; Filing No. 16-3 ¶¶ 10–11). Russell's responsibilities did not include attempting to obtain new patients or referral sources for St. Croix (Filing No. 27-5 ¶ 3).

As a condition of her employment, Russell signed a Confidentiality and Information Access Agreement and a Confidentiality Agreement (together, the "Agreements") (Filing No. 16-4; Filing No. 16-5; Filing No. 16-3 ¶ 11). The Agreements, in part, prohibit Russell from accessing, using, or disclosing any of St. Croix's confidential information outside of her assigned duties for St. Croix or without written patient consent (Filing No. 16-4 at § 2; Filing No. 16-5). These obligations survive the end of her employment with St. Croix (Filing No. 16-4 § 21). Russell did not execute any other agreements while employed at St. Croix (Filing No. 27-5 ¶ 5).

Russell applied for a role at Bristol in November 2025, and on December 19, 2025, she resigned from St. Croix. She joined Bristol as a hospice aide on December 22, 2025. *Id.* ¶¶ 9, 17; (Filing No. 7 ¶ 51). Russell's responsibilities at Bristol, like at St. Croix, involve patient care. Russell is not in Bristol's business development group, she is not compensated or incentivized to obtain patient referrals, and she has never received a patient referral (Filing No. 27-5 ¶¶ 18–20).

When Russell left St. Croix, she did not take any St. Croix documents, data, or information with her, nor did she forward any St. Croix documents to her personal email account (Filing No. 27-5 ¶¶ 10–12). Russell likewise did not keep any patient information when she left. While at St. Croix, Russell exclusively used a company-issued phone to communicate with patients and families and to take notes on patient visits, but she did not text any information from that phone to her personal device, and she turned in that phone when she resigned. *Id.* ¶ 13. To her knowledge, Russell does not have, and has not had, access to St. Croix's documents or information since her resignation. *Id.* ¶¶ 14–15. Russell further attests she has not spoken with any of her former patients about switching to Bristol, and she has not shared any of St. Croix's patient information with any Bristol staff member. *Id.* ¶ 21.

**B. <u>Defendants' Alleged Interactions with St. Croix Patients</u>**

St. Croix alleges Defendants contacted several St. Croix patients in the weeks and months after Russell joined Bristol (Filing No. 27-3 ¶ 6). It cites three incidents as examples.

**1. <u>Solicitation of M.S.</u>**

The first incident involves "M.S.," who lived[2] and received services in her home (Filing No. 16-12 ¶ 6). In late December 2025 or early January 2026, M.S. told her St. Croix case manager that she received an unsolicited telephone call from Bristol asking her whether she would be

[2] M.S. is sadly now deceased.

interested in transferring to Bristol. *Id.* M.S. told her case manager[3] that she did not want to transfer. *Id.* ¶ 7. St. Croix believes Bristol could not have obtained M.S.'s phone number without knowledge of St. Croix's confidential information (Filing No. 16-13 ¶ 10).

Bristol is not familiar with a patient with initials M.S. who receives at-home care from St. Croix, and Russell does not recall ever working with a patient with initials M.S. at St. Croix (Filing No. 27-1 ¶ 16; Filing No. 27-2 ¶ 24; Filing No. 27-3 ¶ 21; Filing No. 27-4 ¶ 10; Filing No. 27-5 ¶ 25). But to the best of Defendants' knowledge, no "cold calls" have ever been made to any St. Croix patients at their homes (Filing No. 27-1 ¶ 17; Filing No. 27-2 ¶ 25; Filing No. 27-3 ¶ 22; Filing No. 27-4 ¶ 11; Filing No. 27-5 ¶ 26).

**2. <u>Attempted Transfer and Solicitations of S.M.</u>**

The second incident involves St. Croix patient "S.M.," who lives at an assisted living facility. Russell was S.M.'s hospice aide during her employment at St. Croix (Filing No. 16-2 ¶ 11). On February 9, 2026, St. Croix employee Ceirsten Vaughn ("Vaughn") received an unsolicited phone call from a Bristol employee named Melissa, requesting that St. Croix send transfer paperwork for S.M. to Bristol. Vaughn informed Melissa that St. Croix initiates transfers only upon a patient's request, so Vaughn declined to send the paperwork, and the call ended (Filing No. 16-11 ¶¶ 7–9). Two minutes later, the Executive Director of Bristol's New Albany office, Madison Hollabaugh ("Hollabaugh"), called St. Croix and again requested the transfer paperwork. Vaughn again declined. Hollabaugh "stated that she understood," and that "was the end of the discussion." *Id.* ¶¶ 13–17. Vaughn then "told another St. Croix employee about [Melissa and Hollabaugh], and the employee spoke with S.M.'s case manager, who spoke with S.M." *Id.* ¶ 18. S.M. told her case

---

[3] Much of St. Croix's evidence, and some of Defendants' evidence, is hearsay. It is well settled that the Court may consider hearsay at the preliminary injunction stage. *See SEC v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991) ("[H]earsay can be considered in entering a preliminary injunction.").

manager that she never requested a transfer and did not want to switch hospice providers (Filing No. 16-2 ¶¶ 8–10; Filing No. 16-11 ¶ 19 (relaying what Vaughn heard from a "St. Croix employee familiar with the matter" about what S.M. said)).

Like with M.S., St. Croix believes that Bristol could not have obtained S.M.'s information except from Russell. But Defendants response explains how Bristol obtained that information. Bristol's business development liaison, Ben Porter ("Porter"), learned about S.M. in January 2026 from the staff at S.M.'s care facility during a "Perfect Harmony" meeting (Filing No. 27-2 ¶ 4). These meetings occur "somewhat regularly" between Bristol and the staff of its various partner facilities. *Id.* The staff told Porter than S.M. was not satisfied with St. Croix's services, so Porter spoke with S.M. after the meeting. *Id.* ¶¶ 5–6. Porter provided S.M. materials about Bristol, but S.M. did not ask to transfer to Bristol at that time. *Id.* ¶ 6.

On February 9, 2026, a nurse at S.M.'s facility reached out to Hollabaugh to tell her that S.M. was interested in Bristol (Filing No. 27-1 ¶ 6; Filing No. ¶ 8; Filing No. 27-7). Hollabaugh relayed this information to Porter, so Porter and another patient liaison, Katie Kirk, went to S.M.'s facility (Filing No. 27-2 ¶¶ 8–9; Filing No. 27-4 ¶ 5). S.M. indicated she "wanted to think about transferring," but two or three other patients who spoke with Porter requested transfers to Bristol (Filing No. 27-2 ¶¶ 12–13). Porter then sent a message to Hollabaugh and Bristol's patient intake team with a list of patients who wanted to transfer, and he mistakenly included S.M. on that list, which led to the abovementioned calls to Vaughn at St. Croix. *Id.* ¶ 14.

The staff at S.M.'s facility reached out to Bristol again in April 2025 to reiterate S.M.'s interest in switching providers, but Porter has not yet followed up on these most recent messages. *Id.* ¶ 21; (Filing No. 27-8). According to a St. Croix employee, "a man in a Bristol shirt" visited S.M.'s room on April 9, 2026, while she was receiving care from a St. Croix employee (Filing No.

28-1 ¶¶ 12–15). In addition, another St. Croix employee was told by S.M. at some point "that a Bristol employee told her that she would gain access to her previous St. Croix aide, Yemetri Russell, if she switched her care to Bristol." (Filing No. 28-1 ¶ 5). The parties dispute whether S.M. welcomed, or was irritated by, her interactions with Bristol (Filing No. 27-2 ¶ 10; Filing No. 28-2 ¶ 10). S.M. ultimately did not transfer to Bristol (Filing No. 27-2 ¶¶ 12–13).

Neither Porter nor Hollabaugh learned any information about S.M. from Russell, and Russell was not present for any of the above interactions with S.M.. (Filing No. 27-5 ¶¶ 7, 20; Filing No. 27-4 ¶ 8). Russell attest that she has not spoken with (or about) S.M. since joining Bristol other than saying "hello" to S.M. in passing Filing No. 27-5 ¶¶ 22–24). Russell further avers that she does not have any documents or information about S.M. in her possession (Filing No. 27-5 ¶ 22).

**3. Improper Patient Solicitations**

Third, St. Croix alleges that Bristol engages in illegal "door-to-door" and "cold call" solicitations of patients in care facilities. According to one St. Croix employee, while a different (unnamed) employee was tending to a patient at River's Crossing assisted living facility (on an unspecified date), two Bristol representatives knocked on the door and asked to speak to the patient (Filing No. 16-13 ¶ 6). The patient was indisposed at the time, and when the St. Croix employee left, Russell and Hollabaugh were waiting outside the door. *Id.*

Bristol denies engaging in "door-to-door" solicitations and acknowledges that such solicitation methods are prohibited (Filing No. 27-7 ¶¶ 28–29; Filing No. 27-1 ¶¶ 18–19; Filing No. 27-2 ¶¶ 30–32). Russell and Hollabaugh specifically deny ever waiting outside a patients' room to "cold call" them (Filing No. 27-1 ¶ 18; Filing No. 27-5 ¶ 29). Bristol admits only that it occasionally hosts "educational events related to hospice care" at hospice facilities, "at which snacks or refreshments are provided." (Filing No. 27 at 10).

St. Croix asserts that throughout its entrance into other markets, "Bristol has been ensnared in a series of lawsuits alleging violations of noncompetition agreements, misappropriation of trade secrets, and inducement of breach of contract." (Filing No. 16-1 at 5–6 (citing Filing No. 7 ¶¶ 24, 35–37)). St. Croix cites three other actions in which Bristol is a defendant to show Bristol's alleged pattern of misconduct: *SouthernCare, Inc. v. Bristol Hospice*, No. 4:25-cv-150-TWP-KMB (S.D. Ind.); *Curo Health Serv. LLC v. Lilly*, No. 1:24-cv-417 (D. Me.); and *International Tutoring Services, LLC v. Tesmer*, No. 117244 (Dist. Ct. Ellis Cnty., Tex.) (Filing No. 16-1 at 6–7).

**C. <u>Procedural History</u>**

St. Croix sent Defendants a cease-and-desist letter on January 30, 2026 (Filing No. 16-14), before the alleged attempt to transfer S.M. to Bristol. Bristol responded that it would investigate the allegations in the letter but provided no further response (Filing No. 16-15). St. Croix filed this lawsuit on March 5, 2026 (Filing No. 1). St. Croix filed the operative Amended Complaint on March 17, 2026 (Filing No. 7), alleging: (I) tortious interference with a business relationship; (II) tortious interference with a contract (against only Bristol); (III) breach of contract (against only Russell); (IV) trade secret misappropriation under the Indiana Uniform Trade Secrets Act, Ind. Code § 24-2-3-1 *et seq.* ("IUTSA"); (V) trade secret misappropriation under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1823 *et seq.* ("DTSA"); and (VII)[4] declaratory judgment that Defendants' misuse of patient information and solicitation tactics are unlawful.

The next week, St. Croix filed the instant Motion for Preliminary Injunction (Filing No. 16). St. Croix argues that Bristol has "engaged in harmful solicitation tactics, beyond industry-standard marketing practices, accessed and utilized patients' confidential health information, and

[4] St. Croix's Amended Complaint also asserts a "claim" for a preliminary injunction (Count VI), but a preliminary injunction is a type of relief, not an independent claim. *See, e.g.*, *Onyango v. Downtown Ent., LLC*, 525 F. App'x 458, 460 (7th Cir. 2013).

sown doubt and concern amongst St. Croix patients about their care." (Filing No. 16-1 at 10). Defendants have filed their response (Filing No. 27), and St. Croix has filed its reply (Filing No. 28). On May 21, 2026, the Court held oral argument on the Motion for Preliminary Injunction (Filing No. 36).

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When a district court considers whether to issue a preliminary injunction, the party seeking the injunctive relief must demonstrate that:

> (1) it has a reasonable likelihood of success on the merits of its claim; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm if preliminary injunctive relief is denied; (4) the irreparable harm it will suffer without preliminary injunctive relief outweighs the irreparable harm the nonmoving party will suffer if the preliminary injunction is granted; and (5) the preliminary injunction will not harm the public interest.

*Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (citation modified).

## III. DISCUSSION

As previously stated, to obtain preliminary injunctive relief, St. Croix must establish: (1) a likelihood of success on the merits; (2) no adequate remedy at law; and (3) irreparable harm absent relief. *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019). If St. Croix fails to show any of these requirements, the Court must deny its request for a preliminary injunction. *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086.

### A. Likelihood of Success on the Merits

To establish a likelihood of success on the merits, "an applicant for preliminary relief bears a significant burden." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). While the applicant need not proffer proof by a preponderance of the evidence, neither "a mere possibility" nor "a better than negligible chance" is enough. *Aon PLC*, 2023 WL 3914886, at *2 (internal quotations and alterations omitted) (citing *Pritzker*, 973 F.3d at 762).

St. Croix argues it will likely succeed on the merits of its claims for tortious interference with a contract, breach of contract, and trade secret misappropriation (Counts II–V) based on Russell's disclosure of confidential information; and its claims for tortious interference with business relationships and for declaratory judgment (Counts I and VII) based on Defendants' allegedly unlawful patient solicitations. The Court will address each group of claims in turn.

#### 1. Claims Arising from Alleged Disclosure of Information (Counts II–V)

Four of St. Croix's claims center around Russell's alleged disclosure of St. Croix's confidential information to Bristol. The elements of each of these claims are well settled. To show Bristol's tortious interference with a contract (Count II), St. Croix must prove: "'(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship.'" *Rice v.*

*Hulsey*, 829 N.E.2d 87, 91 (Ind. App. 2005) (quoting *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 598 n.21 (Ind. 2001)). For its breach of contract claim against Russell (Count III), St. Croix must show "the existence of a contract, the defendant's breach thereof, and damages." *McCalment v. Eli Lilly & Co.*, 860 N.E.2d 884, 894 (Ind. Ct. App. 2007). St. Croix's success on its misappropriation claims under the DTSA or IUTSA[5] (Counts IV and V) requires a showing that (1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damaged the trade secret's owner. *Aon Risk Servs. Cos.. v. Alliant Ins. Servs., Inc.*, 415 F. Supp. 3d 843, 848 (N.D. Ill. 2019).

The common thread through these claims is Russell's alleged disclosure of St. Croix's confidential information, like PHI and other patient information, to Bristol. However, St. Croix's evidence merely shows that Defendants contacted two of St. Croix's patients, S.M. and M.S. St. Croix's claims are otherwise based on its suspicion that Defendants could not have lawfully obtained S.M. or M.S.'s information. St. Croix offers some circumstantial evidence to support its claims, but on the record before the Court, St. Croix has not shown beyond a mere possibility that Bristol sought, that Russell disclosed, or that either of them used, any of St. Croix's confidential information.

As to S.M., St. Croix speculates that Russell must have disclosed information about her former St. Croix patient, S.M., because Bristol could not have obtained S.M.'s information otherwise. As St. Croix argues in its opening brief, Russell "is the only link between [S.M.], St. Croix, and Bristol." (Filing No. 16-1 at 19–20). But in their response, Defendants offer a plausible and uncontested explanation as to how Bristol learned about S.M. independent of Russell. Defendants also offer Russell's sworn statement that she did not take any St. Croix information

[5] The elements of misappropriation claims under the DTSA and the IUTSA are similar. *LigTel Commc'ns, Inc. v. Baicells Techs., Inc.*, 455 F. Supp. 3d 792, 806 (N.D. Ind. 2020). The Court therefore discusses them together.

after her resignation (about S.M. or otherwise), does not possess any such information, did not share any such information, and has not been asked by Bristol to share any such information. These averments are corroborated by the uncontested (albeit self-serving) declarations of Bristol staff who all state they did not ask for, and Russell did not provide, any of St. Croix's confidential information. St. Croix's reply offers no rebuttal on this point.

As to M.S., the parties dispute whether Bristol "cold called" M.S. at her home. St. Croix, on one hand, offers a statement from M.S. made in December 2025 or January 2026 to her St. Croix aide about receiving a call from Bristol on an unspecified date (Filing No. 16-12 ¶¶ 6–8). Defendants, on the other hand, submit sworn declarations from several Bristol employees that they are not aware of any patient with the initials M.S. being serviced by St. Croix and, in any event, they do not "cold call" patients (Filing No. 27-1 ¶ 17; Filing No. 27-2 ¶ 25; Filing No. 27-3 ¶ 22; Filing No. 27-4 ¶ 11; Filing No. 27-5 ¶ 26). Even if the Court were to credit St. Croix's single hearsay statement over Defendants' declarations, however, a more crucial question remains—how did Defendants get M.S.'s phone number? Russell appears to be the only connection between St. Croix and Bristol, yet there is no evidence that M.S. was Russell's patient while at St. Croix or that Russell ever had any information about M.S.; the evidence does not specify the date Bristol called M.S., so it might well have been before Russell began working for Bristol.

St. Croix's limited, circumstantial and speculative evidence does not show that St. Croix is likely to succeed in proving that Bristol intentionally interfered with Russell's Agreements with St. Croix, that Russell breached the Agreements, or that Defendants improperly solicited, acquired, disclosed, or used St. Croix's confidential information. Because St. Croix is unable to make these necessary showings, it has failed to carry its "significant burden" of showing a likelihood of success on the merits of its claims for tortious interference with a contract, breach of contract, or

trade secret misappropriation. *See Elevance Health, Inc. v. Mohan*, No. 23-cv-1749, 2023 WL 6049674, at *7 (S.D. Ind. Sep. 15, 2023); *WCG Clinical, Inc. v. Sitero, LLC*, No. 24-cv-1080, 2025 WL 107662, at *3 (S.D. Ind. Jan. 15, 2025) (citing *Elevance*).

**2. Claims Arising from Alleged Solicitations (Counts I, VII)**

St. Croix's remaining two claims are for tortious interference with a business relationship (Count I) and for a declaratory judgment that Defendants' conduct violates the Indiana Administrative Code and HIPAA (Count VII). The elements of a cause or action for tortious interference with a business relationship are: "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *Gov't Payment Serv., Inc. v. Ace Bail Bonds*, 854 N.E.2d 1205, 1209 (Ind. Ct. App. 2006). In addition to these five elements, St. Croix must show that Defendants acted illegally in achieving their end. *Melton v. Ousley*, 925 N.E.2d 430, 436 (Ind. Ct. App. 2010).

Crucial to St. Croix's tortious interfere and declaratory judgment claims is a showing that Defendants acted unlawfully. St. Croix alleges Defendants did so by misappropriating private patient information and by engaging in door-to-door and cold call solicitations of patients in violation of various state and federal laws (Filing No. 16-1 14–16). Because the Court has already found that St. Croix is not likely to prove that Defendants improperly disclosed or used confidential patient information, the Court will focus on Defendants' alleged solicitation tactics.

St. Croix offers three examples of allegedly unlawful patient solicitations by Defendants. But even when taken together, these examples do not demonstrate a likelihood of success on St. Croix's claims. The first example—Bristol's alleged call to M.S.'s home—is based entirely on a single hearsay statement from M.S. This statement is too vague, and St. Croix's inferences from it

too speculative, to establish a likelihood of success on the merits. As for St. Croix's second example—Bristol's solicitation and attempted transfer of S.M.—Defendants have offered unrebutted evidence that Bristol's solicitations of S.M. were made at the request of staff at S.M.'s facility or S.M. herself. Defendants have also submitted declarations showing that Bristol's attempted transfer of S.M. was unintentional, and that S.M.'s name was erroneously included in a list of other patients who *did* consent to transfers.

St. Croix understandably disputes that an "error" led to S.M.'s attempted transfer (Filing No. 28 at 9–10), but St. Croix's suspicions are based on speculation. *Tarkett USA Inc. v. Maynard*, No. 24-cv-457, 2024 WL 1283570, at *5 (S.D. Ind. Mar. 26, 2024) ("Without evidence casting doubt on the veracity of [the defendant's] sworn statements, [the plaintiff's] belief that [the defendant] will not do as she says is hard to see as anything but speculative—too much so to warrant the extraordinary remedy of preliminary injunctive relief.'" (citation omitted) (quoting *Halzcenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1325 (7th Cir. 2022))); *see also Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1440 (7th Cir. 1986) ("[W]hen . . . there are two equally credible versions of the facts the court should be highly cautious in granting an injunction without the benefit of a full trial.").

St. Croix's third example is the weakest of the three. A St. Croix manager attests that one of her employees "reported" that while the employee "was in the residence of a St. Croix patient, two Bristol representatives knocked on the door and asked to speak with the patient, but the patient was indisposed. When the St. Croix employee left . . . Russell and . . . Hollabaugh . . . were waiting outside the patient's door." (Filing No. 16-13). Like M.S.'s hearsay statement, this unnamed employee's hearsay statement is too vague and speculative to justify injunctive relief. The manager does not specify the date of this alleged interaction or provide the name or initials of the patient.

St. Croix also has no evidence suggesting why Russell and Hollabaugh allegedly visited that patient. As with S.M., Russell and Hollabaugh may have come to see this unnamed patient at the request of the patient or facility staff. St. Croix's evidence therefore does not refute Defendants' evidence that they do not engage in unlawful door-to-door or cold call solicitations.

St. Croix's few, vague, and compellingly disputed examples of purported door-to-door and cold call solicitations are not sufficient to show a likelihood of success on the merits of their claims for tortious interference with business relationships or declaratory judgment.

St. Croix's failure to show a likelihood of success on the merits of its claims, by itself, warrants the denial of its request for a preliminary injunction. However, the Court will address St. Croix's claim of irreparable harm because it fails for similar reasons.

**B. Irreparable Harm with No Adequate Remedy at Law**

"Harm is irreparable if legal remedies available to the movant are inadequate, meaning they are seriously deficient as compared to the harm suffered." *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022). A plaintiff seeking preliminary injunctive relief must show that irreparable injury "is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). A mere "possibility" is not enough. *Id.* "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.*; *see Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020). Further, to show irreparable harm, St. Croix must show a "'likelihood of substantial and *immediate* irreparable injury.'" *L.A. v. Lyons*, 461 U.S. 95, 111 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)) (emphasis added). Speculative future injury is not enough. *Id.*

St. Croix argues that Defendants' improper use of confidential patient information and alleged unlawful solicitations have upset St. Croix's patients and disrupted their care, thereby

harming St. Croix's patient relationships, its goodwill in the New Albany area, and its reputation with referral sources (Filing No. 16-1 at 10–12). St. Croix argues that "[t]hese relationships have been built over time and losing them may mean St. Croix is never able to re-establish them." *Id.* at 11. St. Croix alleges Defendants will not cease their use of St. Croix's information or unlawful solicitations absent an injunction. *Id.* at 11–12.

Defendants respond that St. Croix has not shown a risk of irreparable harm related to the disclosure of its confidential information because it has not shown any such disclosure. Defendants further argue that St. Croix fails to explain how Bristol's alleged solicitation tactics, even if true, have affected or will affect St. Croix's reputation. Defendants also counter that any harm to St. Croix's competitive positioning in the New Albany market is speculative and, in any event, can be remedied by monetary damages (Filing No. 27 at 22–24). The Court is persuaded.

As explained above, the record does not show that Defendants have, or intend to, violate Russell's confidentiality obligations to St. Croix, so St. Croix has not shown likely irreparable harm stemming from the disclosure of its information. The mere possibility that Defendants may obtain or misuse that information in the future is not enough to warrant a preliminary injunction.

St. Croix has also failed to show a likelihood of irreparable harm stemming from Defendants' alleged patient solicitations. At least as of the date of oral argument, no patients had transferred from St. Croix to Bristol. (Filing No. 28-2 ¶ 7 (stating that S.M. re-initiated services with St. Croix despite Bristol's solicitations)); *see Curo Health*, 2024 WL 5247689, at *5 (stating that even if a "Bristol employee made a false statement of material fact to a referral source . . . it is not yet evident that such interference caused any actual damages to Gentiva. . . . I am not prepared at this time to accept Gentiva's assertion that the alleged injury to its reputation and goodwill clears the irreparable injury hurdle."); *Genesys Telecomm. Lab'ys, Inc. v. Morales*, No.

19-cv-695, 2019 WL 6682171, at *6 (S.D. Ind. Dec. 6, 2019) (denying motion for preliminary injunction; "The evidence before the Court on the preliminary injunction record shows that the only customer of [plaintiff] to have been solicited . . . did not accept [defendant's] offers, so there is no harm or injury to support the claim concerning [that client]."). Further, St. Croix fails to explain how any alleged door-to-door or cold call solicitations would reflect poorly on *St. Croix*, rather than Bristol (Filing No. 27 at 23). Indeed, St. Croix's declarations asserts that S.M. and M.S. were upset by Bristol, not by St. Croix (Filing No. 16-2 ¶ 9; Filing No. 16-12 ¶ 8).

Just as the few cited incidents of past alleged solicitations were not enough to show a likelihood of success on the merits of St. Croix's claims, they are not enough to show that St. Croix will suffer any imminent irreparable harm from future unlawful solicitations. "To establish an entitlement to injunctive relief, it is not enough to show that a past wrong may have been committed; rather 'a future threat of irreparable harm must exist to warrant injunctive relief.'" *Elevance*, 2023 WL 6049674, at *7 (quoting *DM Trans, LLC v. Scott*, 38 F.4th 608, 621 (7th Cir. 2022)); *See Tarkett*, 2024 WL 1283570, at *5 (denying motion for preliminary injunction because plaintiff failed to show it is likely to suffer irreparable injury "such as the disclosure of trade secrets, or loss of customer goodwill or reputation"); *Dant Clayton Corp. v. Slocum*, No. 24-cv-95, 2024 WL 3730942, at *4 (S.D. Ind. July 16, 2024) (denying motion for TRO because plaintiff offered only generalized claims of possible harm to reputation or goodwill); *Contrast Honest Abe Roofing Franchise, Inc. v. DCH & Assocs., LLC*, No. 22-cv-387, 2022 WL 16673850, at *2 (S.D. Ind. Nov. 3, 2022) (denying motion for TRO and preliminary injunction because plaintiff "offered only speculative future harms, not well-evidenced likely harms"). Likewise, the fact that Bristol has previously been sued for similar alleged misconduct does not convince the Court that

Defendants are likely to engage in future harmful conduct, particularly because these prior lawsuits show nothing more than *alleged* misconduct.

In addition, St. Croix has not shown that it lacks an adequate remedy at law. Defendants cite several analogous cases in which the plaintiff alleged lost business and harm to its "marketplace positioning" but failed to show that the plaintiff had been disparaged. In each of those cases, the court found that the plaintiff had an adequate remedy at law. *See Classic Components Supply, Inc. v. Mitsubishi Electronics Am., Inc.*, 841 F.2d 163, 164–65 (7th Cir. 1988) (finding adequate remedy at law despite allegations that breach of contract led to customers cancelling orders and disruption to plaintiff's "market development"; "Injuries of this sort, common consequences of broken contracts, yield damages."); *Westwood One Radio Networks, LLC v. Nat'l Collegiate Athletic Ass'n*, 172 N.E.3d 294, 301 (Ind. Ct. App. 2021) (finding no irreparable harm arising from "negative perception of [the plaintiff's] credibility within the industry, resulting from no longer being the exclusive radio broadcaster of NCAA championships"; "Appellate courts have found that such damages can be quantitatively determined and made whole through a legal remedy."); *see also Elevance*, No. 23-cv-1497, 2023 WL 6049674, at *7 n.6 (S.D. Ind. Sep. 15, 2023) ("To the extent that Elevance's claims rest on breach-of-contract principles, it is well established that '[t]he award of damages is the common form of relief for breach of contract,' and the availability of an adequate remedy at law . . . renders injunctive relief inappropriate." (internal citation omitted) (quoting *U.S. v. Winstar Corp.*, 518 U.S. 839, 886 n.30 (1996))).

On reply, St. Croix insists that the "mental and emotional injuries sustained by St. Croix's patients" cannot be quantified (Filing No. 28 at 6–7). While the potential harm to non-parties is relevant to a balancing of the equities, St. Croix must first establish that *it* will suffer irreparable harm with no adequate remedy at law. *See Am. Dairy Queen Corp. v. Brown-Port Co.*, 621 F.3d

255, 259 n.4 (7th Cir. 1980) ("[T]he 'no adequate remedy at law/irreparable injury' prerequisite is not satisfied by the harm that may befall a nonparty."). To the extent any harm to St. Croix's patients might cause them to switch providers, that loss to St. Croix may be quantifiable. As this Court recently held in a very similar case, a hospice provider's loss of patients may be quantifiable because there is an identifiable number of hospice patients, hospice providers maintain ample records of their patients, and Medicare and Medicaid rates in the New Albany area "are well known." *SouthernCare*, 2025 WL 3725592, at *7; *see Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 –46 (7th Cir. 2021) ("[H]arm stemming from lost customers or contracts may be quantifiable if the lost customers or contracts are identifiable."); *Tarkett*, 2024 WL 1283570, at *5 ("[Plaintiff] has not shown that any harm from [defendant's] possession of [plaintiff's] customer list is irreparable. . . . [T]he parties appear to agree that the customers at issue are on a list . . . .").

St. Croix's speculation that Bristol or Russell may, at some point, misappropriate St. Croix's confidential information or, at some point, unlawfully solicit their patients is insufficient to establish the imminent, irreparable harm with no adequate remedy at law that is required to justify the "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 20. For this additional reason, St. Croix's request for a preliminary injunction must be **denied**.

Because St. Croix has not shown a likelihood of success on the merits of its claims or an irreparable harm with no adequate remedy at law, the Court need not (and does not) address the remaining preliminary injunction factors. *Halczenko*, 37 F.4th at 1326.

## IV. CONCLUSION

For the foregoing reasons, St. Croix's Motion for Preliminary Injunction (Filing No. 16) is **DENIED**.

The **Clerk is directed** to update the docket to reflect that the correct spelling of Defendant Yemetri Rusell's name is Yemetri "Russell."

**SO ORDERED.**

Date: October 23, 2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Nicholas R. Franco, III
Goodwin Procter LLP
nfranco@goodwinlaw.com

Allyson R. Mancuso
Holland & Knight LLP
allyson.mancuso@hklaw.com

Jeffrey S. Moad
STITES & HARBISON, PLLC (Louisville)
jmoad@stites.com

Karolyn G. Perry
Holland & Knight LLP
karolyn.perry@hklaw.com

Joseph Rockers
Goodwin Procter LLP
jrockers@goodwinlaw.com

Jennifer Lyn Weaver
Holland & Knight LLP
jennifer.weaver@hklaw.com